OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Zackene Portis, filed April 2, 2008. On October 30, 2007, Portis was indicted on one count of robbery, in violation of R.C. 2911.02(A)(2), a felony of the second degree. On November 5, 2007, Portis entered a plea of not guilty. Following a jury trial, Portis was found guilty of complicity in the commission of robbery, in violation of 2911.02(A)(2) and R.C. 2923.03(A)(2), and he received an eight year sentence, along *Page 2 
with a one year sentence of post release control.
 {¶ 2} The events giving rise to this matter began on October 20, 2007, at approximately 1:30 a.m., when Danielle Bartley was checking identification and collecting cover charges at the door of G.Z. Pete's, a bar in Springfield, Ohio. Zackene Portis and Jaryld Portis, who are brothers, approached the door, and Barltey asked to see their identification, and she told them that the cover charge was three dollars. Danielle described Zackene as follows at trial: "* * *a light skinned male, and he had tattoos on his eye. I remember that distinctive. That night he had jeans, like a toboggan, and a jacket." After a brief dispute, during which Zackene and Jaryld refused to show any identification, the men left. A short time later, the men returned, and again they refused to show identification, and Bartley did not let them enter the bar. The men left a second time.
 {¶ 3} Sometime later, the men returned. According to Danielle, "I met them at the door again. I said, `You guys are not getting in without ID.' And the one that I talked to the entire time, the light-skinned male, * * * He was the only one that said anything to me, and he was looking over my head. I remember that distinctly; and then all of a sudden out of nowhere, the other male came at me." Danielle later described Zackene's conduct at the door before Jaryld attacked her as "scanning the bar." Danielle testified that Jaryld "grabbed my money bag, and threw me to the ground and took off with the money bag." Danielle estimated the money bag contained over $1000.00. According to Danielle, Zackene did not touch her in the course of the robbery or do anything to her. Danielle testified that she got up and chased Jaryld, but she was unable to catch him. After the chase, she returned to the bar, where at least 50 or 60 people were milling around outside, talking about what had just happened. When the police responded, they brought two possible suspects to the bar, and Danielle testified that they were not the men who robbed her. *Page 3 
 {¶ 4} Danielle stated that she "had a bruise on my breast and a bruise on my hip" after the robbery, and her injuries were photographed at the Springfield Police Department.
 {¶ 5} According to Danielle, the door at the bar typically is closed, and it is fitted with a spring so that, if someone opens it, it will close on its own. Danielle testified that if the door remains open, it is because someone is holding it open or has jammed it open.
 {¶ 6} At trial, the State presented a security videotape of what transpired during the robbery. Danielle identified Zackene holding open the bar door partway "probably with his backside" when the men returned for the third time. She also identified Zackene's feet, visible in the video, within the threshold after she had been knocked down. On recross-examination, Danielle conceded that it was possible someone else could have been coming through the door and holding it open while she was on the floor and not watching the door. On re-direct, Danielle testified that Zackene and Jaryld approached the door alone, and that she did not see anyone else in the vicinity of the door between the time she spoke to the men and chased Jaryld.
 {¶ 7} Danielle testified that Detective Travis Baader of the Springfield Police Department contacted her on Monday following the robbery, and he showed her two photo spreads of six photographs each. Danielle identified Zackene in one of the photo spreads and Jaryld in the other.
 {¶ 8} Quincy Cammon also testified for the State. Quincy was having drinks at the bar with Chad Robinson and Troy Elliott the morning of the robbery. Quincy stated that he knew Danielle, having grown up with her brother. According to Quincy, the men were drinking shots, and he suddenly heard Chad yelling. Chad had been standing right next to Quincy, and when Quincy heard Chad yell, Quincy turned and observed Chad lying on the floor in the doorway. According to Quincy, Chad was yelling, "`He tripped me on purpose. He tripped me on purpose.'" *Page 4 
 {¶ 9} Quincy ran over to Zackene, who was the person standing closest to Chad, and grabbed him and confronted him about tripping Chad. At the time Quincy grabbed Zackene, he was standing by the door, inside the bar. Zackene denied tripping Chad. Quincy told Zackene to get out of the bar and pushed him out the door. When Quincy turned around, Zackene shoved Quincy in the back, and Quincy again pushed Zackene out of the bar, going out with him. Quincy indicated that there were other people in the area, but that he did not see anyone but Zackene near Chad. Once outside, "a group of girls" pulled Quincy and Zackene apart. Quincy identified himself, Chad and Zackene as the individuals seen on the videotape at the time Quincy pushed Zackene out of the bar.
 {¶ 10} On cross-examination, Quincy stated that he had been at the bar for about two hours, drinking mixed drinks, beer and shots of tequila. Quincy stated that he did not personally observe Zackene trip Chad.
 {¶ 11} Detective Travis Baader next testified for the State, describing the photo spread procedure he uses with eyewitnesses. According to Travis, in the course of his investigation, he learned that one of the suspects had marks on his face. When discussing the case with another Springfield detective, Darwin Hicks, Darwin informed Travis that he had seen Zackene at a nearby bar the night of the incident, and that he had tattoos on his face. Travis testified that he included Zackene and Jaryd in the line-up of suspects, and that Danielle and Quincy both identified Zackene.
 {¶ 12} Detective Darwin Hicks testified next for the State. According to Darwin, on the night of the robbery, he was off duty at E J's bar, which is one block east of G.Z. Pete's. He observed Zackene, with whom he is familiar, at E J's, along with two women and another man. Zackene in fact spoke to Darwin. Later, Zackene left E J's bar, according to Darwin. Darwin *Page 5 
stepped outside when the police responded to G.Z. Pete's, and he testified, "I'm pretty sure when I came out to get some air, [Zackene] was standing outside of E J's bar." Darwin overheard Zackene "make a statement something like somebody was coming at him. He sidestepped him." Darwin interpreted "sidestepped" to mean, "moving out of somebody's way."
 {¶ 13} Chad Robinson was the final witness to testify for the State. According to Chad, he was drinking with his friends, when he heard Danielle say, "He gots the money. He gots the money." Chad turned around, and then he "seen her getting up off the ground, and I started running behind her. She went out the door so I went out the door, and I felt like a foot or something. I hit a foot and got tripped; and I said, `He tripped me.' And then * * * I ran, kept running after Danielle; and that was it." Chad testified that he did not know who tripped him, but he stated he fell down "from the inside to the outside, through the door."
 {¶ 14} Chad did not catch up with Danielle, and he returned to G.Z. Pete's, where Quincy and Zackene were on the sidewalk "going at it about him tripping me." Chad testified, "[Zackene] said, `If I — he said if I did it, it was an accident. There was just so much going on, if I did it, I didn't mean to do it.'" Chad returned to the bar, and he did not observe where Zackene went.
 {¶ 15} On cross-examination, Chad had difficulty identifying people on the grainy security video. He stated that he did not recall if there was a rug on the floor in front of the door of the bar.
 {¶ 16} Corey Jones, a friend of Zackene's, who was incarcerated in the Clark County Jail, testified for Zackene. According to Corey, he was at G.Z. Pete's the night of the incident. Corey testified that Danielle yelled to him from the door, asking if Corey knew Zackene and Jaryld. Corey stated that he told Danielle the brothers were old enough to get into the bar. When Danielle did not let them enter, they left, and Zackene returned about five minutes later. According to Corey, he did *Page 6 
not see what transpired upon Zackene's return, but he stated that Danielle did not let Zackene in the bar. Corey stated he was in a position to see the front door the entire night, and that he did not observe Zackene trip anyone.
 {¶ 17} Monte Montgomery Browning was the final defense witness. Monte was present at G.Z. Pete's the night of the robbery. Monte testified that he observed Zackene after the robbery, "outside along the wall of G.Z. Pete's, and Chad and Quincy was out there talking to him." Monte stopped and spoke to the men for five or ten minutes, and he testified that there appeared to be no animosity between them. On cross-examination, Monte stated that Zackene is his cousin, that they grew up together, and that they see each other "a lot." Monte stated that he did not see the robbery occur, and that he did not see Jaryld at all that night. Monte observed Chad run out of the bar, but he did not see him get tripped by anyone or fall to the ground.
 {¶ 18} Zackene asserts two assignments of error. His first assignment of error is as follows:
 {¶ 19} "THE EVIDENCE WHICH SUPPORTS APPELLANT'S CONVICTION FOR ROBBERY IS LEGALLY INSUFFICIENT."
 {¶ 20} "In reviewing a claim of insufficient evidence, `[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following Jackson v. Virginia (1979),443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; see, also, State v.Thompkins (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541." State v.McKnight, 107 Ohio St.3d 101, 112, 837 N.E.2d 315, 2005-Ohio-6046, ¶ 70.
 {¶ 21} Zackene was convicted of violating R.C. 2911.02(A)(2), which provides, "No person, *Page 7 
in attempting a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following: * * * (2) Inflict, attempt to inflict, or threaten to inflict physical harm on another." R.C. 2923.03(A)(2) also provides, "No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * * (2) Aid or abet another in committing the offense. * * * (f) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense."
 {¶ 22} Having reviewed the evidence in a light most favorable to the State, we cannot find that the evidence herein is legally insufficient to support Zackene's conviction for complicity in the commission of robbery. The brothers went to the bar and were denied entry three times. Danielle distinctly remembered Zackene "scanning the bar" over her head, and she identified him holding the door open before the robbery occurred. She also identified his feet from the video within the threshold of the door after she had been knocked down. Danielle testified that the brothers approached the bar alone, and that she did not see anyone else in the vicinity of the door between the time she was knocked to the ground and she chased Jaryld. Quincy also testified that he did not see anyone other than Zackene in the area where Chad gave pursuit. Chad testified specifically that he tripped over a foot, and at the scene he yelled, "he tripped me." Chad testified that he fell through the door from the inside to the outside of the bar, in the area where Danielle had identified Zackene's feet visible in the video.
 {¶ 23} From the above evidence, if believed, the jury could have reasonably concluded that on the brothers' third trip to the bar, Zackene, having observed an off duty police officer at another nearby bar, scanned the bar over Danielle's head as a lookout for his brother. The jury could have *Page 8 
further determined that Zackene held open the bar door so that Jaryld could rush in and grab Danielle's money bag, which the brothers most likely observed on their prior attempts to enter the bar. Further, there was no evidence that anyone else but Zackene was present by the door when Chad fell. Chad yelled, "he tripped me," indicating that he was aware of a male presence within his close proximity when he fell. Chad specifically testified that he felt a foot, and given that he fell through the door that Zackene had been identified as holding open, the jury could reasonably conclude that Zackene deliberately tripped Chad to facilitate Jaryld's flight. Finally, Zackene's witnesses did not provide exculpatory evidence, and it was for the jury to assess their credibility, as well as that of the State's witnesses.
 {¶ 24} Because any rational trier of fact could have determined that the essential elements of complicity in the commission of robbery were proven beyond a reasonable doubt, Zackene's first assignment of error is overruled.
 {¶ 25} Portis' second assignment of error is as follows:
 {¶ 26} "APPELLANT'S STATE CONSTITUTIONAL RIGHT TO A GRAND JURY INDICTMENT AND HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS WERE VIOLATED WHEN HIS INDICTMENT DID NOT CHARGE THE MENS REA ELEMENT OF THE CRIME OF ROBBERY AND HE WAS CONSEQUENTLY TRIED AS THOUGH ROBBERY WAS A STRICT LIABILITY OFFENSE."
 {¶ 27} Zackene relies upon State v. Colon, 118 Ohio St.3d 26,2008-Ohio-1624, which addressed "the need for a mens rea statement in indictments, and whether error in this regard is structural or simply subj ect to a plain error analysis. (Citation omitted). InColon, the Ohio Supreme Court considered whether an indictment was defective, where the indictment contained the statutory *Page 9 
language for robbery under R.C. 2911.02(A)(2), but `omitted a mens rea element for the actus reus element stated in subsection (2): "Inflict, attempt to inflict, or threaten to inflict physical harm on another."'Id. at ¶ 10, 885 N.E.2d 917.
 {¶ 28} "The Ohio Supreme Court noted in Colon that R.C. 2911.02 does not specify a mens rea element. However, the court stressed that:
 {¶ 29} "`the mental state of the offender is a part of every criminal offense in Ohio, except those that plainly impose strict liability. * * * Under R.C. 2901.21(A)(2), in order to be found guilty of a criminal offense, a person must have "the requisite degree of culpability for each element as to which a culpable mental state is specified by the section defining the offense."
 {¶ 30} "`R.C. 2901.21(B) addresses both strict-liability statutes and those statutes, like the robbery statute (R.C. 2911.02), that do not expressly state a culpable mental state. * * * R.C. 2901.21(B) states that "[w]hen the section defining an offense does not specify any degree of culpability, and plainly indicates a purpose to impose strict criminal liability for the conduct described in the section, then culpability is not required for a person to be guilty of the offense. When the section neither specifies culpability nor plainly indicates
 {¶ 31} a purpose to impose strict liability, recklessness is sufficient culpability to commit the offense."
 {¶ 32} "`Thus, "recklessness is the catchall culpable mental state for criminal statutes that fail to mention any degree of culpability, except for strict liability statutes, where the accused's mental state is irrelevant."' 2008-Ohio-1624, at ¶ 10-13, 118 Ohio St.3d 26,885 N.E.2d 917.
 {¶ 33} "In Colon, the Ohio Supreme Court also concluded that the defect in the indictment was structural, and could be raised for the first time on appeal. The court then reversed the *Page 10 
defendant's conviction, because the State had treated the offense as one of strict liability, rather than as an offense requiring recklessness.Id. at ¶ 28-32, 885 N.E.2d 917. In its syllabus, the court stated that:
 {¶ 34} "`When an indictment fails to charge a mens rea element of a crime and the defendant fails to raise that defect in the trial court, the defendant has not waived the defect in the indictment.' Id. at syllabus.
 {¶ 35} "Subsequently, on reconsideration, the Ohio Supreme Court limited the syllabus in Colon to the facts of the case. See State v.Colon, 119 Ohio St.3d 204, 205, 2008-Ohio-3749, 893 N.E.2d 169, at ¶ 8. The court noted that the case involved a unique situation, in which the defective indictment had resulted in multiple violations of the defendant's rights.[1] The court, therefore, concluded that a structural error analysis would not be appropriate in cases where multiple errors are not inextricabley linked to the flawed indictment.2008-Ohio-3749, at ¶ 7, 119 Ohio St.3d 204, 893 N.E.2d 169. Instead, in those situations, a plain-error analysis should be used if a defendant has failed to object to the indictment. Id." State v. Turner, Montgomery App. No. 22777, 2008-Ohio-6836, ¶ s 33-40.
 {¶ 36} The indictment herein provides, "That Jaryld Portis and Zackene Portis, on or about October 20, 2007, at Clark County, Ohio, in attempting or committing a theft offense, or in fleeing immediately after the attempt or offense, [did] inflict, attempt to inflict, or threaten to inflict physical *Page 11 
harm on another, in violation of Section 2911.02(A)(2)."
 {¶ 37} The State concedes that the indictment is defective in failing to mention recklessness, but it asserts the error "did not permeate the trial as the jury was instructed with a mental state for Appellant's complicity to commit robbery and the error was not plain error because it did not affect the outcome of the trial."
 {¶ 38} After the following analysis, we agree with the State that structural error analysis is not appropriate.
 {¶ 39} We initially note, like the indictment, the Bill of Particulars herein provides, "On or about October 20th, 2007, the defendants Zackene Portis and Jaryld Portis did steal U.S. currency from G.Z. Pete's Bar located at 204 E. Main St. Springfield, Ohio and did cause physical harm to an employee of the bar in doing so," and it similarly fails to provide Zackene with notice of the mens rea of the second section of the robbery statute.
 {¶ 40} We further note, however, while the prosecutor did not discuss recklessness during trial, he indicated in closing argument: "* * * So I submit to you we have our theft offense. We have our physical harm, and we have Jaryld Portis as our principal perpetrator.
 {¶ 41} "Now, this gets to the real issue in the case; and that's complicity or what's called accomplice liability * * *."
 {¶ 42} In rebuttal closing argument, the prosecutor then indicated that Zackene acted knowingly[2]: "When we review all the evidence, particularly the video and the way the witnesses *Page 12 
described and explained it all to us, I submit to you there's only one conclusion. The defendant knew what was going on. The defendant participated, and he helped his brother out.
 {¶ 43} "It's not an accident that he's holding the door open just long enough for him to get out. It's not an accident that his feet are moving. * * * It's not a coincidence that he's tripping the second person in pursuit, probably the only person in pursuit that would have had an opportunity to physically restrain Jaryld Portis. * * * ."
 {¶ 44} We note, "[w]hen recklessness suffices to establish an element of an offense, then knowledge or purpose is also sufficient culpability for such element." R.C. 2901.22.
 {¶ 45} Colon II stresses that the facts in Colon I "are unique, that applying the structural error analysis to a defective indictment is `appropriate only in rare cases,' and that the holding in Colon Iis [to] be `confined to the facts in that case.'" State v. Taylor, Montgomery App. No. 22564, 2009-Ohio-806, ¶ 19. We find it significant that the prosecutor emphasized Zackene's complicity as "the real issue" in the case, and that he described Zackene's knowing participation in the robbery. While several errors discussed in Colon I are present herein, "the restrictive language of Colon II leads us to conclude that the facts are not sufficiently similar to justify a structural error analysis in this case." Id.
 {¶ 46} "Where a party does not object to an error at trial and the error is not a structural error, a reviewing court `may notice only "[p]lain errors or defects affecting substantial rights." Crim. R. 52(B). Inherent in the rule are three limits placed on reviewing courts for correcting plain error. "First, there must be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be `plain' within the meaning of Crim. R. 52(B), an error must be an `obvious' defect in the trial proceedings. * * * Third, the error must have affected `substantial rights.' We have interpreted *Page 13 
this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." State v. Barnes (2002),94 Ohio St.3d 21, 27, 759 N.E.2d 1240. Courts are to notice plain error "only to prevent a manifest miscarriage of justice." State v. Long (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus.' State v. Byrd, Montgomery App. No. 22406, 2008-Ohio-5515, at ¶ 37-38. The party asserting plain error bears the burden of demonstrating it. Id" Taylor, ¶ 20.
 {¶ 47} The record before us supports a finding that Zackene aided and abetted his brother in the commission of a theft which recklessly caused physical harm to Danielle. This makes him guilty of complicity to robbery. In other words, the outcome of the trial would not have been otherwise had the indictment included the proper mens rea. Accordingly, Zackene's second assignment of error is overruled.
Judgment affirmed.
WOLFF, J., concurs.
[1] "* * * there was no evidence to show that the defendant had notice that recklessness was an element of the crime of robbery, nor was there evidence that the state argued that the defendant's conduct was reckless. * * * Further, the trial court did not include recklessness as an element of the crime when it instructed the jury. * * * In closing argument, the prosecuting attorney treated robbery as a strict-liability offense." Colon, 119 Ohio St.3d 204, 2008-Ohio-3749, at ¶ 6.
[2] "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person had knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).